Good morning, Your Honors. My name is Attorney Daphne Barbie, and I represent Ms. Campbell. This is a race-sex discrimination case under Title VII, and it involves a hostile work But at any rate, the District Court in this case granted summary judgment to the Department of Education, Ms. Campbell's employer. And we believe that the District Court erred because it viewed the evidence in the light most favorable to the defendant, the State of Hawaii, as opposed to viewing the light most favorable to Ms. Campbell in this particular case. I won't go over the words that were uttered to her. You have the briefs on that. But they were very racial and very sexist terms. Students. Are you focusing right now on the hostile work environment claim rather than the disparate treatment claim? I am focusing on the hostile work environment claim. So those statements weren't made, obviously, by the staff. They were made by the students. Yes, they were made by the students. And so the question would be whether the school had done enough to address those statements. Is that right? Absolutely. That's the question in this particular case. And so they said they went through all of the different steps they took. And I think their bottom line was there's only so much you can do with respect to students. And I understood your brief to say, well, but it wouldn't be enough unless they actually stopped the harassment. So help me understand whether, if that is your position, if so, what's the basis for that? Well, first of all, we don't believe that the school took prompt and adequate remedial action. Ms. Campbell had been subjected to these slurs from 2004 all the way to 2007 when she took leave without pay. That's just way too long for the State Department of Education to do anything about this. Well, they were doing a lot about it, were they not? No, they weren't. For example, as I cited in my brief, in one case a student was brought to the principal's office and told not to do it again. But then when she came back into Ms. Campbell's class, she threw skittles at Ms. Campbell and called her certain names that are included in the brief, which are sexist and racist. So is that really taking adequate action? As I suggested in my brief, if you're going to train students, teach students and teach them how to behave when they're adults, that includes not uttering racial, sexist slurs, because if they go into the employment arena when they grow up, they could be fired, their employer could be fired if they carried on this type of action. Students saw that the Department of Education was not doing enough. 47 complaints come on. I can see if it was two or three, but 47 complaints that Ms. Campbell complained about. And then when she went to the vice principal, Mr. Jones, he told her stop bragging on the students. Now, it's important to also note that the United States Equal Employment Opportunity Commission investigated and found reasonable cause to believe that Ms. Campbell was subjected to racial and sexual harassment in the work environment. The EEOC finding was presented to the district court judge. And if you read his decision, he doesn't even mention it. So what specifically should the school have done? The school says we have staged discipline, even suspended, removed some students from classes, suspended some students. What should they have done that they failed to do? Well, for example, the easiest way is to have either a vice principal or principal attend the class where the students are in the class and say we will not tolerate racial slurs at teachers, we will not tolerate sexist slurs at teachers. This was not done. Now, if you can't have a vice principal available to do that, then you have the principal coming into the class and saying, look, this is not acceptable, we do not approve this, there's zero tolerance of racial and sexual slurs towards our teachers. I think that instead of some of the students got slapped on the hands and were sent back to the same class, I think they should have been suspended much longer than one day. For those that were suspended, it was one to two days. That's just not enough. Especially if it keeps repeating itself. It kept repeating itself. So in a way, they were condoning or the students got the impression that this wasn't a serious matter because they kept doing it. And not only that, but when they complained, well, the teacher is mean to us, Ms. Campbell was placed under investigation. And when she did report it to the vice principal, she was told, stop doing this, stop ragging on the students. Instead of, Ms. Campbell, we're going to take your complaints very seriously, this should not be happening, and I personally am going to go down there and talk to the students. That did not occur. So the easiest way would be for the principal or vice principal to go to the class or to even have an auditorium, you know, in school they have these general auditoriums, and just say, look, you know, this is against the law, we need you to stop, do not do this, because if you let it keep going, it's going to snowball and keep building. And in fact, Ms. Campbell produced a witness declaration from a teacher who saw the same students who were harassing Ms. Campbell to be brought back into her class. That was the declaration from Mr. O'Connor, who was a student at the school, and that it didn't stop. He also mentioned that he observed that some of the other teachers didn't really sympathize with Ms. Campbell, said negative remarks about her. So again, you know, if we're going to teach young children in our public schools to be responsible adults, you certainly should take proactive, in this case it would be reactive because it was Ms. Campbell who complained, you should take action and stop this. Not only that, but in the summary judgment hearing, we produced a document from the U.S. Department of Education. So we had the EEOC finding of reasonable cause, and we also had a U.S. Department of Education investigation on the public schools in Hawaii. And again, similar words were used against a Caucasian female teacher, as was used against Ms. Campbell. And interestingly enough, in 2008, the U.S. Department of Education found discrimination in a hostile work environment. So the judge had both the EEOC finding with respect to Ms. Campbell, ignored it, and the U.S. Department of Education finding with respect to another teacher at a different school at about the same period of time, and ignored it. We have cases where the employer is responsible for other employees and has a hostile work environment where other employees are hostile. And we have the same thing at a prison where the degree of an employer's responsibility for officers who are being harassed by prisoners. Are there any cases where there's a hostile work environment where the extent of the employer's responsibility for harassment by students against teachers? Yes, and I did cite them in my brief. And I believe that one is Berger versus, excuse me, Berger-Rothberg versus City of New York, and I did cite that in my brief. And in that case, a similar situation, the students were harassing the teacher. And I believe I cited a couple more. That goes for my tabs. So yes, there has been precedent where high school students have harassed a teacher. And in that case in New York, it was because the teacher was Jewish, and they harassed that teacher. And the court ruled that – I guess the court threw it out on summary judgment. And again, the circuit court ruled that – I'm sorry, the New York court ruled, yes, that students harassing a teacher and the city, the Department of Education, would be liable for that harassment if they didn't do anything, if there was no remedial action. And it continued. And we submit that in Ms. Campbell's case, the DOE didn't do enough and that it wasn't enough to stop the harassment. And that it continued too long. 2004 to 2007 is way too long for this to continue. And we produced actual notes to Your Honor to show that it was going on. We produced – she had to go and call the police. We produced police reports. We produced her numerous complaints via email or written complaints. And it kept going. There was no stopping it. If I may, you've been talking about the hostile work environment claim. What about the disparate treatment claim? What's your position on that? Let me just ask you, has a prima facie case been made? In Ms. Campbell's case, the disparate treatment claim goes to the fact that she was told that she would leave without pay as opposed to leave with pay. And we produced to the judge evidence that a couple of male teachers who were involved in heinous acts such as sexting students were given leave with pay as opposed to leave without pay. What did she request? She requested to leave without pay. They granted her request? Yes, but she's – And was she under investigation for any of the things that the male teachers you just referred to were investigated? I mean, if somebody – if a male teacher is concerned – the concern about a male teacher is that he's sexually harassing students, you'd understand why the school wants that person out of the building while the investigation goes on. There's nothing like that with regard to your client, was there? No, but she contends, and we presented her declaration, that she felt there was nothing else she could do to protect herself. So she asked the school, and they told her she could take leave without pay. She wanted to be out of the building. It wasn't the school's request that she leave the building? Yes, it was not the school's request. That means they're not similarly situated, is there? Well, in her position is she was not told she had an option for leave with pay. Why should the school give her leave with pay? If they didn't want her to leave, why do they give her a year's vacation? It was her choice to leave. I don't see how that makes her comparable to the teachers you're trying to compare her with. Well, the reason is that she was not granted the same option as the males were granted. Oh, they weren't given an option. No, as you described it, they weren't given an option. They were told you're out of the building. We have to pay you while the investigation goes on, and she's not in that situation. The school didn't want her out of the building. So how are they comparable? Well, she also was under investigation. As a result of her complaining about the student harassment, she was placed under investigation. And so, again... But the school didn't ask her to leave, did it? No, it didn't ask her to leave. But when she tried to come back after the two years leave without pay, they told her she could only come back if she agreed to teach remedial math. And that was not her subject area. She's a music teacher, a band teacher, and she also knew French, so she could teach French. And she asked the school if she could do that, and they said no, only remedial math. Did the school need a French teacher? I don't know, to be honest. So the school didn't need a French teacher. Are they supposed to take an extra French section just because that's what she'd like to teach? Or is the school trying to find teachers to teach the subjects they need to teach? Well, the question is also, she said she didn't know remedial math. So why would you want a teacher that does not know the subject matter to teach students? Did you ever have a class in high school taught by somebody who was trying to stay one chapter ahead of you? I did. I mean, that may have been where they had the need. Do you want to save some time for rebuttal? Oh, yes, thank you. Thank you. We'll hear from the department. Good morning, Your Honors. May it please the Court. My name is Miriam Rui, and I represent the State of Hawaii Department of Education. And we'd like to reserve about three minutes for rebuttal, thank you. Oh, but the appellee doesn't get rebuttal, sorry. Thank you. We believe that this appeal presents a case of first impression, and that the Ninth Circuit has not addressed a school's liability for student-on-teacher harassment under Title VII or Title IX. That said, the district court addressed the issue on the merits and concluded that the plaintiff appellant failed to establish a prima facie case of hostile work environment and granted the DOE's motion for summary judgment on that claim and other claims brought under Title VII and Title IX. But let's focus for a moment on the hostile work environment claim, since that's where opposing counsel spent most of her argument. Why isn't there a genuine issue of material fact as to whether the school did enough to stop the student harassment? The school acted following the complaints. It investigated and it meted out discipline where the students were found to have committed violations or student misconduct. And we believe the state of the record is this. Most of the complaints that are in the record occurred in the year 2006. They were addressed by the DOE. And there's a process by which a teacher can complain about student misconduct. So the student is written up in a computer-generated form, a student referral form, and it's sent to the administration. The administration acts on it. In this case, there were two vice principals who investigated alleged misconduct by students. These students were investigated and disciplined accordingly. There is a range of discipline provided for in Chapter 19, which is the Board of Education's Guide on Student Discipline. There are only two written referrals submitted in the record by the plaintiff that indicate students re-offended in the year 2000. And those two referrals are two different students. There's nothing to indicate that they re-offended after they were disciplined. So what we're seeing here is 47, I believe, is the number cited by a plaintiff. Most of these student referrals were for class-cutting, truancy, or other minor student misconduct. There's only a handful here. And the district court correctly decided that the plaintiff failed to show that her work environment was sufficiently severe or pervasive. The court looked at the totality of the circumstances, including the severity. We're not dealing with offensive words, verbal insults, cuss words, swear words uttered by students to their teacher. But they shouldn't be tolerated by the school district. Of course not. A school should protect its teachers. And the school did. The school did a lot, Your Honor. The school investigated these complaints and it took action. Was there any discipline? Absolutely. Such as? Such as there was counseling and warning. There was suspension. There was detention. Ultimately, a student is suspended from school for a certain period of days. I understand that the most severe punishment would be expulsion. But even then, the school has an obligation to provide an education to the student. This was not just the appellant's working environment. This was a school environment. And certainly, the DOE has an interest in teaching students to be respectful and to act in a socially acceptable way. But we're not dealing with inappropriate sexual conduct on the part of the students. Again, these were offensive utterances. We're not dealing with upshot pictures underneath a teacher's skirt. We've said offensive comments, and so has other courts as well, that offensive comments are enough to create a hostile work environment. So the question is, what would be the basis for saying that as a matter of law, what the Department of Education did was enough? If that's the basis for, that was my understanding of the basis for the district court, that there was enough was done. But we would have to say, as a matter of law, that was enough. As a matter of law, they investigated, they disciplined, and the harassment we submit stopped. Now, you're talking about a handful of comments as a district court. So when did it stop? So in 2006, you said that. In 2007, Your Honor, we have. There were no more complaints related to hostile work environments in 2007? That's correct. There were two complaints in 2007 by two different students, and there's no evidence in the record that after those two different students were disciplined, that they re-offended. So in 2008, there were no? Well, to be clear, Your Honor, by 2008, she had left. She had left at the end of the school year in 2007. But the record doesn't reflect a constant barrage of daily harassment, daily verbal harassment. Just because words have sexual content or sexual connotation, the words in and of themselves do not give rise to actionable sexual harassment. The court has to look at the totality of the circumstances, including the social context. And again, this working environment was also a school environment. And so these are not co-workers. These are students. These are teenagers with less standing and maturity than their teacher. These were not supervisors. So in consideration of this dual environment, the court has to look at the constellation of circumstances and events. It sounds to me like you're asking us to answer a harder question than may be necessary. Are you seeking us to say that student comments, as long as there's no physical contact or below the skirt pictures and so forth, that student disparaging comments simply don't and can't raise to the level of a hostile work environment claim? No, Your Honor. I'm not saying that. I'm saying that the words uttered must be viewed in the totality of circumstances, including the social context. And in this case, if I may, you have the words bitch, effing bitch, F-U. This is a school environment. These are teenagers. And we by no means mean to minimize the words that were uttered. But we don't have the level of severity when it comes to the alleged unwelcome conduct, nor the frequency. Again, the district court said, and this is supported by the record. What's the best case that you've cited to give us the standard that we should apply here? Well, we're looking at Mongeli, the Mongeli case. I believe that was the District of Delaware. We cited that. The alleged conduct was far worse. But to be clear, this case also involved special education students, which is not the case here. But in that case, the court held that the plaintiff had not established the element of severe or pervasive. And it's also important, Your Honor, that the test is both subjective and objective. And so in arriving at the decision that, as a matter of law, plaintiff had not established a prima facie case of hostile work environment, she had not shown, met the objective test that a reasonable person in her position would have believed that this was a hostile work environment. Teachers, this is, again, a school. And a reasonable music band teacher should expect that on occasion her students will attempt to undermine her authority, that they will get in trouble, that they will commit misconduct, that they will swear at her, as they did in this case. So anyway, I'd like to move on. Do you have a citation to that Mongeli case? I have the same issue. I can't find it. If you don't have it right there, you can submit it later as a 28-J letter. I thought we had . . . it's a District of Delaware case. And I thought we had . . . I apologize for that. Is it Mongeli versus somebody or somebody versus Mongeli? It's Mongeli versus. It's the District of Delaware. It's a 2007 decision, Your Honor. And I apologize, I did not cite that case, but I learned about it afterwards. And basically . . . Did you file a 28-J on it? Oh, no, Your Honor. Then maybe you can afterwards. Thank you. I'm not sure I'm spelling Mongeli right, so let's get it from you. Okay. So the District Court was correct that there was no prima facie case because objectively speaking, and when you apply the reasonable person test, no reasonable band teacher would have believed that this was a hostile working environment. Again, Your Honor, we're dealing with offensive utterances and verbal insults. With respect to Title VII disparate treatment, the court was correct in dismissing the plaintiff's claim thereunder. She failed to prove adverse action. None of the alleged adverse actions materially altered the terms and conditions of her employment. Throughout her tenure, she retained her position until she decided that she was going to resign. Even when she left for a two-year leave of absence, the leave of absence was not a resignation. There was every indication that she was going to return to school, and the school expected her to return because the school kept open her position. It was only upon learning two years later when she wanted to come back to the school that her teaching line was not as she hoped it would be and included remedial math that she decided she's going to quit. There's nothing to rebut that it was within the principal's authority to assign classes outside of her certification for the good of the school, and in this case, that's where the need was. These were small classes, and she worked in concert with the regular math teacher. So we would just throw this in, that by that time, any alleged hostile work environment was two years in the past. Still, she wanted to come back. Now, the misconduct investigation, school was obligated. School was obligated to perform this investigation, and there's nothing to suggest that this was retaliatory or that because it was kept open, it was an adverse action. The school found, in fact, that there was misconduct. She was alleged to have committed verbal and physical abuse against the students, and the school took no action. And it kept the investigation open because despite numerous requests by both the investigator and the principal, plaintiff failed to submit her statement. Again, we believe that there was no adverse action, and also there was no similarly situated employees. Those elements clearly were not met. The rest for rebuttal, thank you. We won't have a rebuttal. Oh, I'm sorry. Okay, so I can go on. Okay, that's right. So moving on to Title IX, thank you. She ruled on those claims as well. With respect, for the reasons that he discussed, for the reasons that the plaintiff failed to meet her disparate treatment claim, the same analysis applies under Title IX for sex discrimination, and therefore that claim failed as well. Her deliberate indifference claim, Your Honor, was really a hostile work environment claim, and the court determined that the school acted reasonably. Upon learning of the complaints, it acted reasonably, and there was nothing to suggest that it did not. So again, we come back to this. Just to wrap it up, we think the hostile work environment claim here was properly dismissed on summary judgment. Viewing the totality of the circumstances, the context, plaintiff failed to make a prima facie case, and certainly she failed to show objectively that this was a severe or pervasive hostile work environment. Thank you very much. Thank you. We have some time for rebuttal. Thank you. The law on hostile work environment with regards to the words used against my client have been found to be enough to have a trial, and if I recite to you the BKB versus Maui Police Department, where similar words were used against the police officer, calling her an effing howly bee. The suggestion by opposing counsel is that in the classroom situation, teachers should expect that teenagers are going to be hostile in that way. So looking at the totality of the circumstances is different than if it were coworkers. Okay. Well, in this particular case, it kept going on. It didn't stop. And I know that she mentioned that, well, there were various disciplines, but if you look at the disciplines, what was it? Talking to, none of them were expelled. Is it true that the harassment stopped after 2006? No, it did not. It continued in 2007, and we submitted documentation to Your Honor showing at one point one of the students in our class was calling her an effing howly bee, I-C-T-H, and threw Skittles at her, which is more than just words, it's actual action. And no action was taken, and when the principal was asked about that, the principal said, oh, I didn't know about it. But my client made a referral, nothing was done. You've just been told that there were only two complaints about students in the 2007 year. I took that to mean repeated complaints or follow-up complaints about students. Is that not what the record shows? There were different students, different things to my client. Let me focus on what we were told. We were told that we had an array of complaints by Ms. Campbell during the 2006 year, and then in the 2007 year, after whatever discipline was imposed on those students the first time, there were only two recidivists. Is that true? There were, in the record, two more complaints against Ms. Campbell, I mean by Ms. Campbell, about the students. About the same students she complained about before. But that tells us there are only... I mean, the state's argument is that means whatever disciplinary action they took was presumably effective because she didn't complain again about the same students other than these two. She did make extra complaints, but I would disagree with the argument that that means it must have been effective. What was effective is when she resigned, not resigned, but when she left because she couldn't take it anymore. Well, if student Jones is harassing her and she complains, and the next year you may be suggesting Jones continues to harass, but she doesn't tell the administration or doesn't send in one of those reports about that student, what is the administration supposed to do about it? She does send in complaints. Well, let's go back to it then. Because the state just told us there were only two students that became the subject of a follow-up complaint the following year.  submitted by Ms. Campbell about any other students. Is that the state of the record? The state of the record is that she did complain in 2007, and the complaints that we have in the record are two more complaints about students using the same words. Well, she may have complained about additional students, but they're only... So is it the case that there are only two students that became the subject of follow-up complaints the following year? 2007, yes, that is true. But there were complaints about additional students in 2007. Yes, yes. And also, she not only was given negative verbiage... We believe it is sexist. You have to look at it at the reasonable woman standard. And a reasonable woman would not expect to be called these words in a workplace environment. And she also indicates in the record that some of these students actually threatened her. You see the note with the gun? We're over time now, so please wrap it up. Okay, with the gun. And we believe that the school really didn't do anything with respect to the student who wrote D-I-B-I-C-T-H, die, and that's a note in the pictures that she presented to the judge. I got a gun, I'm going to F you up. And one of them even wrote the word N-I-D-G-A to my client, who is Caucasian. And so, you see, this just keeps going on, and students... I think we have your argument. Oh, I'm sorry. Okay, thank you. Oh, one other thing, if I may. I don't have the case that Ms. Louie is citing, too. So I'd like an opportunity to review it once she presents it. She can give the name, the cite, to the clerk, and we'll make sure that the other is served on you as well. Thank you. Okay, thank you. All right, the case of Campbell versus Department of Education is submitted.
judges: O'scannlain, Clifton, Ikuta